Opinion delivered March 15, 1884.

[No. 1656.]

## CHARLES STEWART *v.* THE STATE.

1. PRACTICE—CHARGE OF THE COURT—STATUTE CONSTRUED.—Article 677 of the Code of Criminal Procedure provides that "after the argument in any criminal case is concluded, the judge shall deliver to the jury a written charge, in which he shall distinctly set forth the law applicable to the case. " " " " Properly construed, this Article means that the charge shall present the law applicable to the offense as charged in the indictment, and as made by the evidence admissible under the allegations of the indictment. See the opinion for an illustration.

2. SAME—Otherwise stated, the rule is, that, the indictment permitting the evidence, the law must be distinctly applied to the case as made by the evidence adduced, and not to each and every case which might be made by evidence permissible under the indictment.

3. SAME.—A charge of the court which assumes a state of facts not made by the evidence is erroneous, and, when not such error as would operate to the benefit of the accused, and having been promptly excepted to, is cause for reversal.   See this case in illustration.

APPEAL from the District Court of Smith.    Tried below before the Hon. F. J. McCord.

The indictment in this case charged the appellant with the theft, in Smith county, Texas, on the sixteenth day of November, 1881, of two bales of cotton, the property of C. M. Bachelor. A verdict of guilty assessed his punishment at confinement in the penitentiary for five years.

Oscar Kennedy was the first witness for the state.   He testified that he was the son of Mrs. C. M. Bachelor, who owned the stolen cotton, and lived about seventeen miles east of Tyler. About the middle of November, 1881, witness was in the city of Tyler, and remained until late in the day. *En route* home he went by the house of his uncle, Mr. Barbee, some twelve miles from Tyler, where his mother was to pass the night, and there he took supper, after which he went on home.   Frank Carr passed that night with witness at witness's house.   Next morning, witness's brother-in-law, Jim Hurst, who had agreed to transport to Tyler two bales of cotton which the witness's mother had at Florence's gin, came to the house and informed the witness that the cotton was not at the gin.   Witness, Carr and Hurst went to the gin, about one mile east from witness's house, to look for the cotton.   It was not to be found at the place where it had been lying for a month past, and witness proceeded to look for it about the premises.   Witness could find no wagon tracks in the immediate vicinity of the point where the cotton lay, and, as many wagons had passed along the road near the gin house on that morning, witness encountered much difficulty in getting a start, and could get none, in fact, of any particular wagon that had been at the gin.   Thereupon witness sent Hurst to Longview to keep a lookout for any one who might take the cotton to that point, and sent Carr to Overton for the same purpose.   He, himself, remained to prosecute his search about the gin and neighborhood.

After riding about the premises for some time, witness came upon a wagon track about a half mile west of the gin, which looked like it had been made on the night before. It traveled the road running from a negro church near Jamestown in a northeast direction, and witness followed it. He first discovered the track at the intersection of the gin and church roads. The wagon had been drawn by two mules. Witness followed this track about two and a half miles until it struck the Overton and Mount Sylvan road, going north, when it turned up the said road and went about a half mile to where it crossed the Longview and Tyler road. The track took the west course of this road and followed it to an old field near Ben. Brass's, and into an old field near his, Brass's, house. The track wound around the field two or three times and turned back to the road whence it came, going east to the Overton and Mount Sylvan road; thence south, down said road, to Wilis creek; thence down said creek through the woods until it came to a little brush prairie near the road leading from defendant's and Mr. Prewitt's houses south towards Overton. After winding about over this prairie, the track went back into the road and north towards defendant's house, across Wilis creek, until it came to the brush prairie, where it turned to the east through the woods, and went four hundred yards over a hill, where the witness found the cotton lying on the ground, the heads of the bales cut out, and the bales somewhat covered by brush and leaves.

From this point the witness trailed the wagon back to the road and up towards the defendant's house. He now noticed that a piece of brush had been hitched into the wagon wheel just as it got back into the road, and that, with each revolution of the wheel, the brush blotted the tracks of other wagons which had passed along the road. Witness followed this trail up to the defendant's house, and found his, defendant's, wagon standing in front of the gate some twenty feet from his house. But one other wagon, and that drawn by a mule and a horse, had passed along that road that morning. It went toward Overton. The defendant's house was on the east side of, and about fifteen steps from the road. Another road ran east and west near the defendant's house. Mr. Cal. Prewitt's house stood about four hundred yards from defendant's house. Wagon tracks ran along this road between these two houses, but none of them were fresh except the one which was made by the wagon going toward Overton and drawn by the horse and mule.

Witness borrowed a wagon and team from Mr. Prewitt that evening, and got Mr. James Scott and a negro to go with him and assist him in loading the cotton. He saw the defendant, and requested him also to go with him, but defendant declined, saying that he had to go to a field to see about some cotton of his own. Arriving at the place where the cotton was secreted, Mr. Scott, in looking around, found the heads of the bales about twenty steps from the cotton, covered up with leaves. These heads bore the letters C. B., the brand of the witness's mother. Witness gave no one his consent to take the cotton from the gin. The gin from which the cotton was taken is in Smith county. The point where it was found was near the line of Gregg county. The cotton was worth more than twenty dollars per bale. Witness struck the wagon track about nine or ten o'clock in the morning, and found the cotton between twelve and two o'clock on the same day. The whole distance traveled by the wagon was about ten or twelve miles.

Since he could find no wagon tracks leading up to where the cotton lay at the gin, and could see no evidences of the bales having been rolled, it was the opinion of the witness that the cotton bales were taken up and carried to the wagon. No one man, in the opinion of the witness, could have loaded the cotton on the wagon without assistance; and the witness did not think that any two men could take up and carry a bale of cotton. From the point where the witness first struck the tracks of the wagon to the gin, that is from the fork of the road to the gin, so many wagons had passed that it was impossible to identify any particular wagon track. From where the track turned out of the gin road into the church road, to where the witness found the cotton, no other wagon tracks interfered, and witness easily trailed it along the route detailed, which was an unfrequented route. The mule tracks were very small. Witnesss saw no others to correspond with them on the whole round, and had no difficulty whatever in following them. Both the mules and the wagon made deep inpressions in the ground throughout the whole course. Leaving the cotton in the woods when he first found it, witness easily tracked the wagon and mules into the road, within three hundred yards of defendant's house. Where the wagon turned out of the road at defendant's house, "clods" of dirt had rolled from the side into the ruts, showing that but one other wagon had passed afterward, which was the one that went on toward Overton. The cotton belonged to the witness

and his mother, Mrs. C. B. Bachelor. It was raised on Mrs. Bachelor's place, but was controlled by the witness. Mrs. Bachelor knew of it only through witness. Mrs. Bachelor is very old and feeble and too ill to attend court. This cotton was subsequently sold by witness in Tyler.

James Scott was the next witness for the State. He testified that in November, 1881, he lived in Gregg county. One evening during that month, Oscar Kennedy came to him and requested him to go with him and assist in loading some cotton which had been stolen from him, Kennedy, and which he had found in the woods. Witness and a negro accompanied Kennedy, who had procured a wagon and team from Mr. Cal. Prewitt, on which the three loaded the cotton. The cotton was then behind a hill, in the woods, about four hundred yards from the road, and about four hundred yards from the defendant's house. The witness saw the tracks of the wagon going from the road to the cotton, and returning. He could not track the wagon all the way by the impressions in the ground, but could by the broken and bent bushes. He could see, in soft places, that the wagon had been drawn by two small mules. The wagon turned out of the road coming from the south, and when it returned to the road from where the cotton was found, it turned up the road, north, toward the defendant's house. Several other wagons had passed along that road that day, and witness could not tell whether or not the tracks were made by the defendant's wagon. Kennedy had found the cotton several hours before this. The defendant's wagon was standing in front of his house when the witness got there. Defendant usually drove two small mules, unlike any others in the neighborhood of which the witness had any knowledge.

Cal. Prewitt testified, for the prosecution, that he lived in Gregg county, near the Smith county line. Defendant lived on the witness's place in 1881. Witness remembered the occasion of Oscar Kennedy's visit to his house in search of stolen cotton. Kennedy wanted witness to go with him to the place where he found the cotton. The witness declined to go, as he did not wish to figure as a witness. On the day previous to this, the witness and the defendant went to Overton, eight miles south, with cotton. When witness got ready to return that evening, he told the defendant, who replied that he was not then ready. Defendant was at home next morning, but witness did not know when he got back. On the day in question, that of Kennedy's

visit, witness went on to Overton with turkeys and chickens. He was of opinion that defendant assisted him to load that morning, but was not certain. His, defendant's, son Lewis assisted witness in catching the fowls the night before. Witness got back home about the middle of the afternoon. He drove a mule and horse on this occasion. The mule may have been one of defendant's. Defendant's mules were a pair of very small black animals, unlike any in the neighborhood. Wheelis, of Overton, held a mortgage on them, which he foreclosed, but which witness redeemed for the defendant, either a few days before or a few days after the theft of the cotton. Defendant lives on witness's place, about two hundred yards south of witness's house. No road ran from defendant's to witness's house, except the one which passed through the witness's field. At the time of this transaction, travelers of all kinds passed through the witness's field, but since that time witness had kept his gates locked. Witness saw the defendant pass his home on the evening that the cotton was found. He passed near Kennedy and witness while they were talking. He did not look as he usually does, but rather depressed—"a little down." Ben. Brass lives two miles east of witness. Wilis creek is about a half mile south of witness's house. Speaking of the general reputation of the defendant, the witness said that he was regarded as rascally—dishonest. Witness, however, had got along with him very well, and did not know that defendant had ever stolen anything from him. Witness once missed a pair of wagon lines, for which the defendant paid, saying that his son Lewis had stolen them.

James Hurst testified, for the State, that he was a son-in-law of Mrs. C. M. Bachelor. She and her son, Oscar Kennedy, intrusted him to go to Florence's gin and get their two bales of cotton and take them to Tyler. Early next morning witness went to the gin with the wagon, but found the cotton gone. He immediately reported the fact to Kennedy and Mrs. Bachelor, and by instruction went to Longview in search of the cotton. Not finding it he returned and learned it had been recovered. Witness then took it to Tyler and had it sold. Mrs. Bachelor is now sick and unable to attend court. Witness gave no one his consent to take the cotton.

Dowdy Haney testified, for the State, that he remembered the time the defendant was charged to have stolen some cotton. On that night he, Bob Henry, Heck Davis and others met on

Wilis creek, about a half mile from where the defendant lived, to go 'possum hunting. One of the boys went back to get more dogs and while the others of the party were waiting his return, a man came along with a wagon containing two bales of cotton and a woman. The wagon was drawn by two small black mules. It was a starlight night, and too dark for witness to see plainly who the parties were. He thought at first that the man was the defendant, but Bob Henry three times called loudly, "halloo, Charles!" to which no reply was given. Witness then concluded that the man was not the defendant. Witness had no idea who the woman was. This was, in the opinion of the witness, about eight or nine o'clock, p. m. The man with the wagon went on toward the defendant's house, about fifty or a hundred yards, and then turned into the woods to the right and went in the direction of the place where the cotton was found. Witness thought from the appearance of the man and the mules that the man was the defendant, until Bob Henry called and got no answer. The State closed.

Lewis Stewart testified, for the defense, that he was a son of the defendant, and lived with him in 1881, on Mr. Prewitt's place. He remembered the time the defendant was charged with this theft. On the day before it happened defendant and Mr. Prewitt went to Overton, each with a load of cotton. Mr. Prewitt got home a short time before dark, and a little after that the witness helped him, Prewitt, catch and box some chickens and turkeys for market. This was before supper. Witness then went home and ate his supper, and a little later the defendant came home alone, having on his wagon a bacon box and a smaller goods box. It was then, in the opinion of the witness, between seven and eight o'clock. Witness had not yet gone to bed. No one was at the defendant's house when defendant got back that night save the witness and his step-mother, Caroline Stewart. The witness knew of no mules in the neighborhood similar to those owned by his father.

Frank Carr testified, for the defense, that he remembered the time when the cotton was taken from Florence's gin. Witness was in the town of Overton on the day before it happened. When he left Overton, about an hour and a half before sunset, he saw the defendant, who said that he was not quite ready to start home, and witness left him in Overton. Witness went back by Florence's gin, reaching it about dark. The two bales of cotton in question were then at the gin, and the witness

placed two rails on them that Hurst, who was to take them to Tyler next morning, might know them.  Witness passed that night with Oscar Kennedy.  Next morning Hurst came to the house and said that the cotton was gone, and witness went with Kennedy and Hurst to look for it.  Witness could not see that a wagon had been near the cotton that night, nor could he see any sign that the cotton had been rolled away.  There were quite a number of wagon tracks going to and from the gin.  Three miles an hour at ordinary gait is good traveling for a loaded wagon.  The gin yard was hard.  Much cotton had been ginned and hauled there.

The motion for new trial raised the one question involved in the opinion.

*C. G. White,* for the appellant

*J. H. Burts,* Assistant Attorney General, for the State.

HURT, JUDGE.   Article 677 of the Code of Criminal Procedure provides that, "After the argument of any criminal case is concluded, the judge shall deliver to the jury a written charge. in which he shall distinctly set forth the law applicable to the case."

Applicable to what case?  Any and every case which might be presented by any state of facts admissible under the indictment?  Most evidently not.   But clearly "applicable to *the case*" charged in the indictment and presented by the evidence. By this article the charge of the court is rigidly restricted; first, to the allegations in the indictment; and second, to the case made by the evidence—that evidence which is admissible under the allegations of the indictment.

We will illustrate by a case of murder, because in murder cases trial judges most frequently commit the same error we are attempting specifically to point out in this opinion.

A is charged with the murder of B.  Now all murder committed by poison, starving, torture, or with express malice, or committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, or burglary, is murder of the first degree. And under an indictment for murder of the first degree by reason of express malice, an indictment which omits all mention of the perpetration of, or the attempt to perpetrate, arson, rape, robbery or burglary, evidence can be adduced on the trial to

establish murder of the first degree by reason of the fact that the murder was committed in the perpetration of, or the attempt to perpetrate, either of these offenses, provided the means, or instrument used by which life was destroyed, be that which is alleged in the indictment.

Now suppose that upon the trial no evidence is adduced tending to prove that the murder was committed in the perpetration of, or the attempt to perpetrate, either of these offenses, *the case*— that to which the law must be *distinctly applied* by the charge, bearing upon the question as to whether the homicide was murder of the first or second degree—is simply one with express malice *vel non*. And to this case, thus charged in the indictment and made by the evidence, *the law must be distinctly applied*, notwithstanding, under an indictment thus framed, evidence could be legally introduced tending to show that the murder was committed in the perpetration of, or the attempt to perpetrate these offenses.

If this be the rule in cases in which evidence is admissible under an indictment thus framed, to show that the murder was committed in the perpetration of these offenses, with much stronger reason does the rule condemn a charge which applies the law to a murder committed by poison or starvation; a murder committed in such manner, and by such means, as are wholly at variance with the means or manner charged in the indictment; and in regard to a murder committed by such means, under an indictment thus framed, no evidence could be admitted.

The rule, therefore, is, the indictment permitting the evidence, the *law must be distinctly applied to the case as made by the evidence*, and not to each and every case which might be made by evidence *permissible under the indictment*.

Now let us apply the rule to the case in hand. Appellant was convicted of the theft of two bales of cotton. No witness saw him when he took the cotton, it being taken at night from the gin yard. But, to the contrary, it required very close examination of wagon tracks, and a remarkable discrimination between the different tracks, to successfully pursue the wagon of the thief to the discovery of the stolen cotton in the woods. There is not the slightest hint in the statement of facts that the defendant came into possession of the cotton by lawful means—by some false pretext; but, as we have seen, it required nice work

and a high degree of perseverance, to discover that *defendant had* the cotton.

The case presented in Article 727, Penal Code, was not *the case made by the evidence in this cause.* The learned judge, however, charged the jury that, "You are further instructed that the taking must be unlawful, so that if the cotton came into possession of the defendant by lawful means, the subsequent appropriation of it by the defendant is not theft; but if the taking, though originally lawful, was obtained by any false pretext, or with intent to deprive the owner of the value thereof and to appropriate the same to the use and benefit of defendant, and the same is so appropriated, the offense of theft is complete." To this charge the defendant excepted and reserved his bill of exceptions. This was error, for the evidence presented no such case to which the law could be *distinctly applied.* Did it injure defendant? The learned counsel for defendant thought so, for he promptly excepted. It certainly was not beneficial to defendant, and may have confused the jury. That it was assuming is evident, and it may have induced the jury to believe that such a state of facts did exist, especially in the mind of the learned presiding judge.

This charge being evidently wrong, and not beneficial to the defendant, and having been excepted to at the time, we have no discretion, but must reverse the judgment. (Arts. 677, 685, Code Crim. Proc.) The judgment is reversed and the cause remanded.

*Reversed and remanded.*